## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

BYRON LAKE

VERSUS

SCHOHARIE COUNTY, ET AL

CIVIL ACTION NO. 01-1284

JUDGE DONALD E. WALTER

## MEMORANDUM RULING

Before this Court are Motions for Judgment as a Matter of Law filed on behalf of defendants, the County of Schoharie [Doc. #100], the County of Schenectady [Doc. #98], EMSA Correctional Care, Inc. ("EMSA") and Phyllis Harrison [Doc. #99]. Plaintiff, Byron Lake, opposes these motions. For the reasons assigned herein, defendant County of Schoharie's motion is **GRANTED** and a Judgment as a Matter of Law is hereby **ENTERED** in favor of defendant. Thus, plaintiff's claims against County of Schoharie are hereby **DISMISSED WITH PREJUDICE**. Defendant County of Schenectaedy's motion is **DENIED**. Defendant EMSA and Phyllis Harrison's motion is **GRANTED IN PART** and **DENIED IN PART**. Judgment as a Matter of Law is hereby **ENTERED** in favor of EMSA as to plaintiff's punitive damages claim only.

## STATEMENT OF THE CASE

Plaintiff, Byron Lake ("Lake"), was an inmate in the Schenectady County Jail ("Schenectady") from August 1998 to November 1998. On August 7, Lake was transferred to the Schoharie County Jail ("Schoharie") to relieve overcrowding at Schenectady. On August 15, while at Schoharie, Lake began having chest pains and numbness in his arms. Around 12:35 a.m. on

1

August 16, he reported his symptoms to James Wood ("Wood"), the correctional officer on duty. Wood, in turn, notified John Huber ("Huber"), a deputy sheriff at Schoharie, of Lake's complaints. Trial Tr. vol. 1, 113, July 12, 2005.

Huber took Lake's vital statistics and then called Dr. Bruce Russell, Schoharie's primary physician at the time, twice, but was unable to reach him. Trial Tr. vol. 1, 117. Following Schoharie procedure, Huber then called County Jail Administrator Walter Myers ("Myers") and advised him of plaintiff's complaints. Id. Although there is conflicting testimony regarding the severity of plaintiff's symptoms, at that point in time, Myers did not think plaintiff was having a heart attack based on his conversation with Huber. Trial Tr. vol. 1, 84. Myers decided, however, that Lake needed medical attention.

Following Schoharie County policy, Lake was transferred back to Schenectady less than three hours after the notification to Wood. Trial Tr. vol. 1, 78. Schenectady's medical services were contracted to EMSA, a for-profit company that employed the doctors and nurses who worked at the jail. After his initial observation at Schenectady on the morning of August 16, 1998, EMSA Nurse Jeffrey Crandall ("Crandall") determined that Lake's condition did not warrant hospitalization. Trial Tr. vol. 3, 120, July 14, 2005. The following morning, Lake complained of being very ill and another EMSA employee, Nurse Administrator Phyliss Harrison ("Harrison"), was called in by the guards. After examining Lake further and consulting with an EMSA doctor, Harrison decided to send Lake to Ellis Hospital for medical treatment. Trial Tr. vol. 3, 153-155. It was later learned that Lake had suffered from a heart attack.

## PROCEDURAL HISTORY

Lake brought this action under 42 U.S.C. §1983 alleging that defendants violated his civil rights by failing to provide adequate medical care.  This Court held a jury trial on the matter.  The jury entered a verdict for plaintiff, finding that the County of Schoharie, the County of Schenectady, EMSA Correctional Care, Inc., and Phyllis Harrison were all liable to plaintiff for $150,000 in compensatory damages.  The jury also found EMSA liable to plaintiff for punitive damages of $632,988.

In their motions, defendants assert that in order for liability to exist against a municipality, the plaintiff must prove that his constitutional rights were violated by an official policy of the municipality, or by the failure of the municipality to properly train or supervise its employees. Because the policy/failure to train or supervise claims are based on inadequate medical care of an inmate, the alleged constitutional violations must have been committed with deliberate indifference to Lake's rights.  Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50. L.Ed.2d 251 (1976); Johnson v. Wright, 412 F.3d 398, 403 (2nd Cir. 2005).

Defendant EMSA also asserts in its motion that the jury should not have awarded punitive damages because the EMSA employees' conduct was not recklessly or callously indifferent to the rights of plaintiff, nor was it driven by evil motive or intent.  For the reasons below, this Court agrees with defendant's assertion.

## STANDARD FOR JUDGMENT AS A MATTER OF LAW

At the close of evidence, a Rule 50 Motion was made by all defendants and the motions were taken under advisement by this Court. As stated in the Rule 50 Advisory Committee notes, a court

3

"may often wisely decline to rule on a motion for judgment as a matter of law made at the close of evidence, and it is not inappropriate for the moving party to suggest such a postponement of the ruling until after a verdict has been rendered." Fed. R. Civ. P. 50. After the jury reached its verdict, this Court set out a briefing schedule which was mainly adhered to.

The Second Circuit has ruled that judgment as a matter of law "may not be properly granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in [his] favor." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 286 (2nd Cir. 1998). Accordingly, this Court shall view the evidence on record in the light most favorable to Lake, and will only grant defendants' motions if the evidence is insufficient to permit a reasonable juror to find in Lake's favor.

The Galdieri Court further explained, holding that a court must defer to "all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of the witnesses or consider the weight of the evidence." Id. A motion for judgment as a matter of law should not be granted unless:

> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or
> (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [him].

Id (internal citations omitted). The case sub judice falls under the second option, as there is such an overwhelming amount of evidence in favor of defendant County of Schoharie that reasonable and fair minded jurors could not have arrived at the verdict for Lake.

4

## LAW AND ANALYSIS

### I. County of Schoharie's Rule 50 Motion

The County of Schoharie asserts that plaintiff failed to establish that a county policy or procedure violated his right to adequate medical care. A municipality like Schoharie can only be liable for a plaintiff's injuries when the "execution of a [county]'s policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Monell v. Dep't of Soc.Servs. of the City of New York, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611 (1978); Coon v. Town of Springfield, 404 F.3d 683, 686 (2nd Cir. 2005) (holding that municipalities should not be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort).

Municipalities can also be liable for a plaintiff's injuries when a constitutionally valid policy is unconstitutionally applied by a municipal employee. The municipality will be liable "if the employee has not been adequately trained and the constitutional wrong has been caused by that failure to train." City of Canton v. Harris, 489 U.S. 378, 387-88, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). Only if the municipality's failure to train is "so severe as to constitute gross negligence or deliberate indifference to a plaintiff's rights" will liability attach. Sarus v. Rotundo, 831 F.3d 397, 401 (2nd Cir. 1987); see also City of Canton, 489 U.S. at 389.

With regard to §1983 claims of inadequate medical treatment, the plaintiff must show that the policy or training deficiencies amounted to deliberate indifference to his serious medical needs. Estelle, 429 U.S. at 104; Johnson, 412 F.3d at 403. A prisoner must satisfy both an objective and a subjective analysis in order to show an Eight Amendment violation. He must prove that the deprivation was sufficiently serious and that his condition was one of great urgency that may produce

death, degeneration or extreme pain.  Johnson, 412 F.3d at 403.  The plaintiff must also show that the public official who denied his medical care acted with deliberate indifference to his needs, that the official knew of and disregarded an excessive risk to the prisoner's safety.  Id.

Myers, Schoharie County's Jail Administrator at the time of Lake's hospitalization, testified that it was Schoharie's custom and practice to send sick inmates back to their jail of origin for medical care.  Trial Tr. vol. 1, 78.  Inmates with serious medical problems would be taken directly to the hospital if their conditions warranted that treatment.  Trial Tr. vol. 1, 79.  The officer in charge of the shift would make the judgment, based on his experience and training, as to whether hospitalization was or was not necessary.  Id.   In 1998, "severe chest pains" was one of the serious medical conditions that warranted hospitalization.  Trial Tr. vol. 1, 82.  Schoharie established this emergency policy at trial using standards from the Commission of Corrections (NY State), the New York State Sheriff's Association, and New York State Correction Law.  Trial Tr. vol. 1, 97.

At the time of Lake's injuries, there were no doctors or nurses on the night-shift at the jail, since they only came to the prison three or four times per week.  Trial Tr. vol. 1, 89.  There is conflicting testimony as to the exact nature of Lake's condition at the time of his complaints to Wood.  Deputies Huber and Wood both testified that Lake's symptoms were consistent with heart attack symptoms.  Trial Tr. vol. 1, 116 & 139.  However, Lake was able to walk, unassisted, from his cell to the medical tier of the prison, then to the holding area to wait for transportation to Shenectady, a total of about 100 yards.  Trial Tr. vol. 1, 131.

Throughout the incident at Schoharie, Wood or Huber could have called an ambulance themselves had they thought Lake's condition warranted hospitalization.  Trial Tr. vol.1, 128.  Both Wood and Huber had been trained in basic emergency medical care by Red Cross certified

6

instructors. This training included instruction on how to detect heart attack symptoms. Trial Tr. vol. 1, 115-116. Huber testified that he felt that Lake's chest pain was not of a severe nature, and he chose to consult with Dr. Russell for advice on how to handle Lake's complaints. However, Dr. Russell neither answered his phone nor responded to pages. Trial Tr. vol. 1, 117. Huber then consulted Myers as to the next course of action. Id. From his conversation with Huber, Myers deduced that Lake was not having a heart attack, though he still needed medical care, which was available on a twenty-four hour basis at Schenectady, but not at Schoharie. Trial Tr. vol 1, 85. Therefore, per Schoharie County policy, Lake was transferred back to Schenectady.

At no time during this course of events did Schoharie County act with deliberate indifference to Lake's need for medical treatment. When he complained that he was feeling sick and had chest pains, guards alerted the officer in charge of the shift, Huber, who moved Lake to the medical unit and took his vital statistics. When it was clear to Huber that Lake was indeed sick, Huber called the prison doctor for advice, but those calls were never answered. Following policy, he then called Myers who made the decision to transfer Lake back to Schenectady where he could be treated by the full-time medical staff there. The transfer was accomplished within three hours from the time of Lake's first complaint to Wood.

Schoharie's emergency medical procedure was based on standards from New York state corrections agencies. At no time did the Commission of Corrections notify Schoharie that their medical service was insufficient. Trial Tr. vol. 1, 91. The decision not to hospitalize Lake was made by Myers based on information provided by Huber, who had adequate training to recognize the signs of a heart attack. Huber and Wood received training, as well as refresher courses, in basic CPR by an American Red Cross representative. Trial Tr. vol. 1, 115-16. This training was in accordance

7

with the rules and regulations of the Commission of Corrections.  Trial Tr. vol. 1, 102.

Because of the overwhelming evidence that Schoharie's emergency medical policy did not result in a denial of medical care to Lake, as well as the overwhelming evidence that there was no failure to train Schoharie's employees that could amount to a deliberate indifference to Lake's medical needs, Schoharie's Rule 50 motion should be granted.

## II.  County of Schenectady's & EMSA's Rule 50 Motions

The County of Schenectady asserts that plaintiff never proved that his injuries were caused by the unconstitutional acts of Schenectady employees, carried out in furtherance of a government policy or custom.  Schenectady further asserts that there was no evidence showing that a lack of training of Schenectady's employees led to the deprivation of Lake's constitutional rights.  Plaintiff asserts that because Schenectady assigned Robert Elwell ("Elwell") as supervisor of the medical services provided by EMSA, Schenectady should be liable for Elwell's failure to supervise or train the EMSA employees.  Plaintiff further asserts that Elwell, as chief policymaker for the Schenectady jail, delegated policy making to EMSA.  Accordingly, Schenectady County should be held liable for EMSA's deliberate indifference.

As stated above, in order for a municipality to be liable in a §1983 claim, it must be shown that a plaintiff's injuries were the result of that municipality's policy or custom.  Monell, 436 U.S. at 694.  Another way to establish municipal liability is to show that a lack of supervision or training that amounts to deliberate indifference to the plaintiff's constitutional rights caused his injuries.  City of Canton, 489 U.S. at 387-389.  As stated in the jury instructions, EMSA employees were considered to be County of Schenectady employees for purposes of plaintiff's claims.  Thus, any deliberate indifference by an EMSA employee in furtherance of a policy or custom of EMSA or

Schenectady, would also result in liability against Schenectady for Lake's injuries.  See <u>Andrews v.</u> <u>Camden County</u>, 95. F.Supp.2d 217, 228 (D.N.J. 2000) (holding that when contracting for prison health services, a county or municipality remains liable for constitutional deprivations caused by the policies or customs of the health service).  Accordingly, this Court shall review EMSA's Rule 50 Motion together with Schenectady's.

Both EMSA and Schenectady's Rule 50 Motions as to liability are denied.  While the evidence, in the opinion of this Court, is thin, deference to the jury compels denials of these motions. <u>Galdieri</u>, 136 F.3d at 286.  For reasons stated below, this Court is compelled to defer to the jury's inference that EMSA and Schenectady acted with deliberate indifference to Lake's medical needs. However, EMSA's conduct does not rise to a level warranting punitive damages, and the jury's award of $632,988 is overturned.

## III. Punitive Damages

Because this Court finds that none of the defendants acted with malicious or callous indifference to Lake's medical needs, the punitive damages award must be overturned, as there is no evidence that EMSA acted with a sufficiently culpable state of mind.  Punitive damages are only available in an action pursuant to 42 U.S.C. § 1983 "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." <u>Smith v. Wade</u>, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983).  Because none of the EMSA employees acted with such reckless or callous indifference to Lake's right to medical care, the punitive damages award is vacated.

In 1998, Elwell, jail administrator, was responsible for all operations at Schenectady. Elwell developed policies and procedures with respect to the jail.  Trial Tr. vol. 1, 43.  To alleviate

overcrowding, Schenectady implemented a policy of sending inmates to nearby facilities and paying those jails $80.00 per day to house each inmate. Trial Tr. vol. 1, 44-45. Although there was no written agreement between Schenectady County and Schoharie County regarding these inmate transfers, it was understood that transferred inmates remained the responsibility of Schenectady County. Trial Tri. vol. 1, 46. There was also an oral understanding that if any situation arose, including a medical emergency, that Schoharie could not handle itself, the inmate was to be transferred back to Schenectady. Trial Tr. vol. 1, 47-49. All transfers, including Lake's, were approved by the New York State Department of Corrections. Trial Tr. vol. 1, 64.

According to County Manager Robert McEvoy ("McEvoy"), in 1997, due to licensing and union issues with its nurses, Schenectady was forced to hire a private medical care provider to provide medical services for the jail, EMSA. Trial Tr. vol. 2, 45-50, July 13, 2005. EMSA was paid a flat fee of $1.9 million for a three-year contract. Id. EMSA would absorb any costs of medical treatment for the inmates, including trips for medical care and emergencies that required trips outside of the jail. Trial Tr. vol. 2, 51. The decision to contract with EMSA was made to bring Schenectady within the standards of the medical community and the Nursing Practices Act. Before EMSA and Schenectady entered into the contract, LPNs were doing work that only RNs were licensed to do, and some LPNs earned higher salaries than RNs. Trial Tr. vol. 2, 42-43.

Neither Schenectady's prisoner transfer policy nor its contract with EMSA showed that Schenectady was maliciously indifferent to Lake's medical needs. In fact, once Schoharie contacted officers at Schenectady regarding Lake's complaints, it took just twelve minutes to decide to transport Lake back to Schenectady. Trial Tr. vol. 1, 124. Once returned to Schenectady, Lake was observed and tested by Crandall, a RN employed by EMSA, who made a medical judgment that

hospitalization was not required.

Crandall first examined Lake upon his return to Schenectady County Jail on August 16, 1998 at 3:10 a.m., approximately two and one-half hours after his initial complaint. Crandall made subjective and objective assessments of Lake, which involved assessing the patient's own description of his symptoms while analyzing physical data, such as vital sign readings taken by Crandall. Trial Tr. vol. 3, 112. Crandall did not observe any conditions in Lake that would suggest a heart attack. Crandall placed Lake on the medical tier of the jail facility rather than taking him to the hospital. Trial Tr. vol. 3, 115-16.

Crandall testified that he observed Lake two more times, at 6:00 a.m. and 8:45 a.m. on August 16. At 6:00 a.m., Crandall observed Lake sleeping comfortably and apparently without pain. Trial Tr. vol 3, 118. At 8:45 a.m., Crandall again took Lake's vital signs, but they remained unchanged. Lake did not elaborate or make any further complaints about his condition, and at no time during the latter observation did Crandall believe hospitalization was necessary. Trial Tr. vol. 3, 119-20.

Lake was neither seen nor treated by medical personnel over the next twenty-four hours. He testified that during this day his pain intensified and decreased numerous times, and that he complained several times to guards but never saw any nurses who could help him. Trial Tr. vol. 2, 72. However, Lake also testified that over the course of August 16th, he spent time in the day room outside of his cell watching television and speaking with other inmates. Trial Tr. vol. 2, 104. Also, according to Schenectady log books, from 9:00 a.m. on August 16 until 9:00 p.m. on August 17, nurses were on Lake's tier four times dispensing medication to other inmates. Trial Tr. vol. 2, 63-66. According to prison corrections officers, Lake could have complained out loud to these nurses or

submitted a sick slip to the guard had he so desired.  Id.

Harrison, the Schenectady Nurse Administrator, saw Lake at 8:40 a.m. on August 17, 1998 on the medical tier in response to a call that Lake had thrown up his breakfast and was suffering from what he thought was a major heart attack.  Lake claimed that, while waiting for a wheelchair to take him to the nurse's station, guards tapped him with their feet and Harrison exclaimed, "you are not having a heart attack. [T]here's nothing wrong with you, you just d[on't] want to be in the Schoharie County Jail."  Trial Tr. vol. 2, 74-75.  Nevertheless, Lake was  taken to the nurse's station where Harrison telephoned Dr. W.J. Duke Dufresne ("Dr. Dufresne"), a doctor employed by EMSA.

Dr. Dufresne, in his deposition, claims that Harrison explained that a patient at the jail was having a shortness of breath but did not have a history of asthma. Trial Tr. vol. 3, 9.  Dr. Dufresne told Harrison to give Lake an Albuterol inhaler and to observe the patient.  Id.  After about ten minutes, Harrison realized that Lake had failed to respond to the Albuterol, and she called Dr. Dufresne back.  Trial Tr. vol. 3, 155.  She further explained that Lake was also suffering from chest pains, and that she recommended he be taken to the hospital for evaluation.    Trial Tr. vol. 3, 10.  Lake was quickly taken to Ellis Hospital, where he eventually received treatment for a heart attack.

As with Lake's treatment at Schoharie, there is an overwhelming amount of evidence that Schenectady and EMSA were not maliciously indifferent to Lake's medical needs.   After a preliminary examination of Lake, Crandall determined that Lake suffered from mild hypertension and did not require hospitalization.  Trial Tr. vol. 2, 169.  While there is conflicting testimony as to whether Crandall's decision was reasonable or not, it is clear to this Court that Crandall was not callously indifferent to Lake's needs at this time, nor was he motivated by evil intent.  Crandall made medical observations and decided that Lake should continue to be monitored over the next couple

of days.  Trial Tr. vol. 3, 149-150.

When Harrison arrived at Lake's cell on the morning of August 17, it was clear that he was suffering from some sort of medical emergency. Although Harrison arguably made some rather cold comments relating to her opinion of the validity of Lake's condition, she still brought Lake immediately to the nurse's station in a wheelchair and called Dr. Dufresne. Because many of Lake's symptoms were seemingly related to a shortness of breath, Dr. Dufresne instructed Harrison to give Lake an inhaler commonly used to treat asthma. Again, this was a medical judgment that may or may not have been reasonable under the circumstances, but it was not malicious indifference to Lake's medical needs. It took Harrison only ten minutes to decide that the inhaler was not working, and she then called Dr. Dufresne back. Dr. Dufresne decided to send Lake to Ellis Hospital. Trial Tr. vol. 3, 155.

As stated above, a plaintiff must show that the defendant acted with malicious or callous indifference to his constitutional rights in order to warrant an award of punitive damages. Wade, 461 U.S. at 56. There is an overwhelming amount of evidence that defendant EMSA's conduct did rise to this high standard.  Therefore, EMSA's Rule 50 Motion as to the punitive damages claim is granted.

## IV.  Attorney's Fees

Unless counsel can agree as to the amount of attorney's fees to be awarded to Plaintiff, this issue shall be referred to the magistrate for a Report and Recommendation.

13

## CONCLUSION

For the reasons stated above, defendant Schoharie's Rule 50 Motion [doc. #100] is hereby **GRANTED** and plaintiff's claims are **DISMISSED WITH PREJUDICE**.   Defendant Schenectady's Rule 50 Motion [doc. #98] is hereby **DENIED**.   Defendants EMSA and Phyllis Harrison's Rule 50 Motions are hereby **DENIED IN PART** and **GRANTED IN PART**.

**THUS DONE AND SIGNED,** in Shreveport, Louisiana, this 29th day of December, 2005.

DONALD E. WALTER
SENIOR UNITED STATES DISTRICT JUDGE